**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

LISA GERHARDT                                                                    PLAINTIFF

v.                              No. 4:06CV01595 JLH

LIBERTY LIFE ASSURANCE COMPANY
OF BOSTON; UNIVERSAL HEALTH
SERVICES, INC.; UHS OF DELAWARE, INC.;
and THE BRIDGEWAY, INC.                                                  DEFENDANTS

## OPINION AND ORDER

Lisa Gerhardt brings this action under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.*, against Liberty Life Assurance Company of Boston, Universal Health Services, Inc., UHS of Delaware, Inc., and The Bridgeway, Inc. Gerhardt seeks review of an adverse disability benefits determination by Liberty. Both Gerhardt (Docket #37) and the defendants (Docket #53) have filed their ERISA briefs. For all the reasons set forth below, the Court remands Gerhardt's claim for long-term disability benefits to Liberty Life Assurance Company of Boston, the Claims Administrator for the plan.

## I.

Lisa Gerhardt is fifty-four years old. (Adm. R. 1.) She became a licensed registered nurse in 1981. Subsequent to 1981 and prior to 2000, Gerhardt worked as an Industrial Nurse and Benefits Coordinator for six years, a Marketing Director selling healthcare services for two years, a Charge/Staff Nurse for two years, a Nurse Manager/Assistant Program Director for five years, an Adult Services Coordinator for seven months, and most recently a Director of Addictive Services and Director of Outpatient/Chemical Dependency for four years. (Adm. R. 536.) She held this last position with The Bridgeway, a psychiatric hospital located in North Little Rock, Arkansas, that is

owned and operated by Universal Health Services, Inc. Gerhardt's last day of work at the Bridgeway was July 26, 2000. (Adm. R. 331.) At the time, she was suffering from osteoarthritis in both hands and required bilateral basal joint arthroplasty of both thumbs, the first of which was to take place on August, 28, 2000. (Adm. R. 316.) Gerhardt then applied for disability benefits under the ERISA plan sponsored by Universal Health Services, Inc.

###### A.        THE TERMS OF THE PLAN

Universal Health Services, Inc. provides disability benefits to employees under a long-term disability plan insured by Liberty Life Assurance Company of Boston. The plan is an employee welfare benefits plan established pursuant to ERISA. The plan defines "disability" as follows:

> **"Disability"** or **"Disabled"** means during the Elimination Period and the next 24 months of Disability the Covered Person is unable to perform all of the material and substantial duties of his occupation on an Active Employment basis because of an Injury or Sickness; and[, a]fter 24 months of benefits have been paid, the Covered Person is unable to perform, with reasonable continuity, all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity.

(Adm. R. 823.) Thus, a plan participant is initially disabled if he is unable to perform one or more of the essential duties of his occupation, but after the Elimination Period plus twenty-four months, a plan participant must be "unable to perform, with reasonable continuity, all of the material and substantial duties of his own or any other occupation . . . ." The definition of disability essentially includes the definition of any occupation, which is an occupation for which the plan participant "is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity." "**Material and Substantial Duties'** means responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be

reasonably eliminated or modified." (Adm. R. 825.)  The Elimination Period applicable to Gerhardt

was ninety days.  (Adm. R. 297.)  The plan gives Liberty discretion to determine eligibility benefits

and construe the terms of the plan.  (Adm. R. 845.)

The plan also places the burden on participants to provide Liberty with proof of disability.

It states in pertinent part:

**Disability Benefit**

When Liberty receives proof that a Covered Person is Disabled due to Injury or
Sickness and requires the regular attendance of a Physician, Liberty will pay the
Covered Person a Monthly Benefit after the end of the Elimination Period.  The
benefit will be paid for the period of Disability if the Covered Person gives to Liberty
proof of continued:

    1.   Disability; and

    2.   regular attendance of a Physician**.**

The proof must be given upon Liberty's request and at the Covered Person's expense.

\* \* \*

**Discontinuation of Long Term Disability Benefits**

The Monthly Benefit will cease on the earliest of:

\* \* \*

9.   the date the Covered Person or his Physician does not provide Liberty with
required medical Proof which supports physical or mental impairment that is
demonstrated by clinical and laboratory evidence . . . .

\* \* \*

2. Proof

\* \* \*

    c.   Proof of continued Disability or Partial Disability, when applicable, and

regular attendance of a Physician must be given to Liberty within 30 days of the request for the proof.

d.  The proof must cover, when applicable:

i.   the date Disability or Partial Disability started;

ii.  the cause of Disability or Partial Disability; and

iii. the degree of Disability or Partial Disability.

(Adm. R. 1272, 1277-78, 1287.)

## B.  GERHARDT'S CLAIM AND MEDICAL HISTORY

As noted above, Gerhardt last worked on July 26, 2000.  In October of 2000, Gerhardt applied for long-term disability benefits.  (Adm. R. 1258.)  Liberty approved her claim and began making monthly benefit payments as of November 5, 2000.  (Adm. R. 297.).  In August of 2000, Gerhardt applied for Social Security disability benefits, and in October of 2001, her application was approved.  (Adm. R. 181, 1258.)  Liberty thereafter reduced its payment of benefits to Gerhardt in an amount equal to the amount of benefits awarded to Gerhardt by the Social Security Administration.  (Adm. R. 177-78.)  According to Gerhardt, the Social Security Administration continues to pay disability benefits to this day, although in an amount less than the benefits due to Gerhardt under Liberty's policy.  Until May 5, 2006, Liberty paid the remainder of the long-term disability benefits to Gerhardt.

Dr. Neema Suphan has served as Gerhardt's primary physician from 1999 to the present.  On August 1, 2000, Suphan diagnosed Gerhardt with severe rheumatoid arthritis and severe osteoarthritis, degenerative joint changes, severe bursitis of both hips, and severe deformities of the knees.  Suphan referred Gerhardt to Dr. Ed Weber, a hand specialist, for surgery.  (Adm. R. 320.)

4

On August 28, 2000, Weber performed an arthroplasty on Gerhardt as treatment for osteoarthritis of the right thumb base. (Adm. R. 280-81.) On November 29, 2000, Weber performed a left thumb base arthroplasty, along with a carpal tunnel release and tenodesis of the left thumb joint. (Adm. R. 273-74.)

Throughout and subsequent to this time period, Gerhardt suffered from a variety of medical conditions. On August 10, 2000, Dr. Robert Weinstein determined that Gerhardt had abnormal negative bone density in her L3 lateral level, volumetric lumbar, and femoral neck. (Adm. R. 105.) In April of 2001, Suphan diagnosed Gerhardt with severe rheumatoid arthritis and polyarthritis, severe depression, irritable bowel syndrome, and colitis. (Adm. R. 257.) On December 5, 2001, Suphan diagnosed Gerhardt with rheumatoid arthritis, joint swelling, and chronic pain syndrome. (Adm. R. 168.) On January 18, 2002, Suphan diagnosed Gerhardt with acute rheumatoid arthritis with degenerative joint disease of the bones, osteoperosis, fatigue, and severe depression. (Adm. R. 165.)

On March 5, 2002, Dr. Hugo Jasin examined Gerhardt and diagnosed her with osteoarthritis of the hands and feet, fibromyalgia, and left trochanteric bursitis. (Adm. R. 95-96.) Jasin saw Gerhardt again on April 18, 2002, finding that her condition had improved since his prior visit. (Adm. R. 84.) Jasin did conclude that Gerhardt had spondylolisthesis at the L5 level on the right with degenerative changes at L5-S1. (Adm. R. 86.) On May 30, 2002, a report from the Department of Neurology at the University of Arkansas for Medical Sciences indicated that Gerhardt had symptoms that were consistent with an acute right L5 radiculopathy. (Adm. R. 80.)

In September of 2002, Liberty determined that Gerhardt continued to qualify for long-term disability benefits under the any occupation standard. Liberty informed Gerhardt that the claim

would be evaluated periodically to determine ongoing disability.  (Adm. R. 141.)

On September 5, 2002, Dr. Glenn Pait, a neurosurgeon at UAMS, saw Gerhardt.  His impression was that she had degenerative lumbar disc disease, but also concluded that the "alignment of the lumbar spine is quite acceptable.  There is no evidence of abnormal slippage."  (Adm. R. 77.) On May 1, 2003, Jasin again examined Gerhardt, concluding that her fibromyalgia was improved but that x-rays showed spondylitises at the L5 level and that changes in L5-S1 corresponded to the electromyography studies that showed some denervation of the right L5 root.  Jasin also agreed with Pait's conclusion that surgery was not necessary at that time.  (Adm. R. 68.)

In January of 2004, Suphan completed a Physical Capacities Form for Gerhardt.  Suphan indicated that Gerhardt could sit for four hours per day, stand and walk for two hours per day, bend at her waist, climb stairs, drive on the job, push and pull for one hour per day, handle, grasp, and use fine finger dexterity occasionally, and squat, kneel, climb a ladder, reach, and have repetitive movements for zero hours per day.  Suphan indicated that Gerhardt would need breaks during the activities that she was able to perform, and that she was unable to work eight hours per workday because of constant pain in her shoulders, neck, back, hand, fingers, and feet.  (Adm. R. 6.)

In June of 2004, Dr. Lon Burba of the Diplomat American Board of Psychiatry and Neurology examined Gerhardt.  His impressions were that he suspected small fiber polyneuropathy, fibromyalgia, and L5 radiculopathy in the past.  He noted that she had paresthesias in the extremities, a "give away weakness of all four extremities," and that she was trembling throughout her exam. (Adm. R. 980-81.)

In early July of 2004, Gerhardt fell and broke her tailbone.  (Adm. R. 806.)  Gerhardt attributes this break to her decreased bone density, which increases the risk of bone fracture.

On August 3, 2004, Suphan completed a second Physical Capacities Form on Gerhardt. Suphan listed Gerhardt's diagnoses as polyneuropathy, myositis, degenerative joint disease, and osteoporosis. Suphan stated that Gerhardt could sit, stand, walk, climb, drive, push, pull, and reach approximately one third of the time. Suphan also stated that Gerhardt could have repetitive motions of her elbows, shoulders, and ankles approximately one third of the time. Suphan stated that Gerhardt could occasionally have repetitive motions with her wrist and lift less than ten pounds, and that Gerhardt could never squat, bend, kneel, grasp, or lift more than ten pounds. Suphan also wrote that Gerhardt was unable to use her hands due to a loss of dexterity, and that these restrictions would be imposed for a lifetime. In the blank next to "Estimated Return to Work Date," Suphan wrote "n/a" and "unknown." (Adm. R. 724.)

On September 7, 2004, Dr. Bruce Baskin, a physiatrist, performed an Independent Medical Evaluation of Gerhardt at Liberty's request. His impressions and diagnoses of Gerhardt included "osteoarthritis of the hands, fibromyalgia, degenerative disc disease of the lumbar spine with a L5-S1 spondylolisthesis on plain films and an L5 radiculopathy by EMG," a questionable history of polyneuropathy, denervation in parts of the spine, a history of depression, anxiety, and possibly attention deficit hyperactivity disorder, and an abnormal neurological examination with decreased motor strength in the left lower extremity. (Adm. R. 688-89.) Baskin further responded to a series of questions about Gerhardt's conditions as follows:

1.    Claimant's diagnosis is osteoarthritis and fibromyalgia, based on your review of the medical information provided, your physical examination and prevailing medical standards, is this the correct diagnosis?

      Answer: . . . She does have osteoarthritis of the hands, probable fibromyalgia based on my tender point assessment, chronic fatigue, concentration problems and some associated ADHD, which are all consistent with fibromyalgia and the diagnostic

criteria.

2.      Does she meet the criteria for the diagnosis of fibromyalgia?

Answer: Yes, see above.

* * *

She does manifest signs and symptoms of depression and the Zoloft is appropriate, although she is taking a large dose.

* * *

4.      Provide a description of the claimant's impairments, if any, and outline how any impairment translates to restrictions and limitations on physical activities.

Answer: Ms. Gerhardt does have an impairment with a spondylolisthesis in the lumbar spine at L5-S1 and an associated radiculopathy it appears. This needs to be worked up further. Without an MRI scan it cannot be determined if the patient has a need for surgery or not. She has not had, it appears, any aggressive physical therapy for her lumbar spine complaints and that would be warranted. Her other impairments are the thumb joint replacement surgeries, which seem to be doing fairly well. The fibromyalgia is not a ratable condition, although it can cause substantial pain. Most of my patients with fibromyalgia are not disabled, however, and continue to work in spite of their pain complaints.

5.      If you feel restrictions and limitations are warranted at this time, please outline the restrictions and limitations and the medical basis for them. Is she capable of performing full time sedentary duties within these restrictions/limitations? If not, please provide the medical evidence to support that position.

Answer: It would be my opinion that Ms. Gerhardt could perform full time sedentary duties. I don't know what her current restrictions and limitations are and for that I would suggest that we get a functional capacity evaluation scheduled . . . . I would be happy to comment further on her work restrictions, if any, once [she has had a functional capacity evaluation.]

* * *

7.      Are the claimant's self-reported limitations clinically supported or substantiated based on your review of the medical information and your examination?

Answer: No, they are not without a functional capacity evaluation to assess validity.

8.      Provide a description of your direct observation of the claimant, noting the degree to which such observations may or may not be consistent with their reported impairments.

Answer: I did not observe any behavior that would be inconsistent with the patient's complaints.  However, my time with the patient was limited to probably 1 hour or maybe 1 hour and 15 minutes. [A functional capacity evaluation] would be much more useful for that purpose.

9.      Please provide a description of claimant's hands/wrists and indicate range of motion and grip strength.

Answer: Ms. Gerhardt's hands and wrists had functional range of motion, without restriction in any plane.  There was about 4+ out of 5 grip strength bilaterally.  She had full flexion, extension, radial and ulnar deviation at the wrist and full range of motion of the MCP, PIP and DIP joints of the hands bilaterally.  I did note a tremor in the right hand.  The hands were otherwise unremarkable.

10.     Is there any evidence of polyneuropathy?  If so, how does the presence of this translate to the restrictions and limitations?

Answer: There is no evidence of polyneuropathy but there does appear to be evidence of radiculopathy in the left lower extremity, probably L4 or 5.  This does affect the patient's gait somewhat and she is weak in the dorsi and plantar flexors of the left ankle and does have objective findings of radiculopathy by Dr. Rudnicki's EMG.

(Adm. R. 690-92.)

On August 8, 2005, Dr. Bruce Safman, a physical medicine and rehabilitation physician, also performed an Independent Medical Examination of Gerhardt at Liberty's request.  He responded to similar questions from Liberty as follows:

1.      Provide a description of the claimant's impairments, if any, and outline how any impairment translates to restrictions and limitations on physical activities.

Ms. Gerhardt's primary impairment relates to a diagnosis of fibromyalgia.  She virtually has all the comorbidities, including symptoms suggestive of irritable bowel syndrome, TMJ syndrome, chronic fatigue, headaches, sleep disorder, non-restorative sleep, restless leg syndrome, as well as paresthesias of the hands and feet, cognitive problems and balance problems, all which have been described in patient's [sic] with fibromyalgia.  Her overall

9

functional impairment as it relates to the primary condition of fibromyalgia would include reduced stamina with exertional activities and reduction in her overall capacity to perform activities such as heavy lifting, carrying, prolonged walking, etc.

2.      What would be reasonable restrictions/limitations?  Please be very specific regarding frequency and length of time and activity that can be done.

Due to Ms. Gerhardt's reduced stamina and overall decreased strength, she would be restricted in her ability to perform lifting and carrying activities in excess of 20 pounds on an occasional basis, ten pounds on a frequent basis, and a negligible amount on a continuous basis.  She would not be restricted in her ability to sit; however, standing and walking activities would be restricted to an occasional basis up to two hours out of an eight-hour day at a frequency of 30 minutes per time.  The condition of fibromyalgia tends to fluctuate from day to day and she may have some days better than others.  The cognitive fatigue problems and pain problems will support the above functional restrictions.  Furthermore, her impairment would evolve from short-term memory problems, chronic fatigue, and overall generalized pain, which would restrict her ability to participate in heavy physical activities, as well as cognitive demanding activities.  She would be able to perform reaching above, at and below shoulder level on an occasional basis.  She would not be significantly restricted in her ability to perform upper extremity activities, including that of handling, fingering, and fine finger dexterity.  Squatting, bending at the waist, kneeling, and twisting would be restricted to an occasional basis.

* * *

5.      Please provide a description of the claimant's hand/wrists and indicate range of motion and grip strength.  Are any restrictions/limitations related to her hands/wrists?  Please be very specific.

Passive range of motion of the digits of her hands and wrists appear to be normal.  There was diminished effort as the grip strength could not be assessed . . . and I do not feel that there would be any necessary restrictions and/or limitations based on primary hand pathology.

6.      Does any of the medical evidence support inability to perform full time sedentary to light activities?

As outlined above, the available medical findings support a diagnosis of fibromyalgia.  Individuals with fibromyalgia, although functionally impaired,

most often are not precluded from performing sustainable activity in either a sedentary or light capacity within the restrictions as noted. The objective medical evidence, as well as reviewing her activity level on surveillance video, would be consistent with an individual who could perform full time sedentary to light activities as defined by the U.S. Department of Labor Dictionary Occupational Titles.

7. If you are unable to determine from the medical evidence and your physical exam her ability to perform full time sedentary to light activities, or provide specific restrictions/limitations, do you feel an FCE would be indicated? If so, would you provide the script and review the report when it becomes available?

As outlined above, the medical findings, as well as her activity level as seen on surveillance video, would be consistent with an individual who could perform work within either the sedentary or light category as defined by the U.S. Department of Labor. She is seen walking in a normal fashion on surveillance video and although it may be "a good day", the days in which she is having increased symptomatology might not necessarily preclude her from performing at a level consistent with that of a sedentary or light level as noted. Of course, a Functional Capacity Evaluation would offer additional medical evidence to support the fact that she would or would not have the sustainable capacity to function in either the sedentary or light capacity. If a Functional Capacity Evaluation was performed subsequent to this evaluation, I would be happy to review it for further comment and provide a supplemental report to this examination. However, her level of impairment at the time of evaluation would not support an inability to perform at a reduced capacity consistent with either that of a sedentary or light activity.

(Adm. R. 480-85.) Safman also wrote that Gerhardt had "significant depression and anxiety" and that she had been on numerous medications. (Adm. R. 474-75.)

On October 17, 2005, Teresa Marques, a vocational consultant, authored a Transferable Skills Analysis, Labor Market Survey on Gerhardt. Marques based her report on file information and standard vocational resources only and did not converse directly with Gerhardt. (Adm. R. 537.) With regard to Gerhardt's medications, Marques noted only that Gerhardt had been "treated with medication (one being trazadone) and various therapies." (Adm. R. 535.) Marques based the

parameters of Gerhardt's physical ability to work largely on Safman's Independent Medical Evaluation report, stating that

> A Transferable Skills Analysis (TSA) was completed based on . . . full time sedentary to light work parameters with 2 hours per day of standing and walking in 30 minute increments, occasional reaching at all levels, squatting, bending, kneeling and twisting with no handling, fingering and fine finger dexterity restrictions. **It is noted that 'non-cognitively demanding' functions were recommended. However, there has been no neuropsychological evaluation and no specific levels or areas of cognitive deficits determined. Thus, [these] are the identified occupations which all have various levels of cognitive demands.**

(Adm. R. 535-36.)   Based on Gerhardt's medical and work history, Marques identified five occupations that fit within these parameters: (1) Community Health/Program Director, (2) Nurse Case Manager, (3) Utilization Review Nurse, (4) Health Services Coordinator and (5) Ambulance/Emergency Dispatcher.  (Adm. R. 537.)

On December 8, 2005, Suphan responded to Baskin's Independent Medical Evaluation.  She wrote that Gerhardt continued to suffer from the following: (1) connective tissue disorder, (2) interstitial lung disease, (3) generalized osteoarthritis, (4) synovitis, (5) depression, (6) ruptured breast implants, (7) chronic obstructive pulmonary disease, (8) polyneuropathy of the lower extremities, (9) attention deficit syndrome, (10), chronic pain, (11) weight loss, (12) leukopenia, (13) fibromyalgia, (14) a L5 spondylodesis, (15) a cyst on her left hip, (16) severe osteoarthritis of the left hip, and (17) chronic demyelination at L5 and S1 on the right.  (Adm. R. 510-11.)  Suphan disagreed with Baskin's assessment of Gerhardt's bilateral muscle strength of her upper extremities, stating that Baskin "did not physically exam [sic] her thumb and index finger and see what her strength was in terms of gripping a pen or pencil."  Suphan's examination showed that Gerhardt was "unable to hold a pen or pencil with a grip to function in a job with writing."  (Adm. R. 511.)

Suphan concluded, "Ms. Lisa Gerhardt's symptoms have somewhat subsided, but she continues not to be well enough to be holding a full time job at this point." (Adm. R. 512.)

On March 7, 2006, Suphan responded to Safman's Independent Medical Evaluation report. Suphan primarily disagreed with Safman's assessment that Gerhardt's primary impairment related to fibromyalgia and reiterated Gerhardt's other physical impairments. Suphan also further discussed the cumulative effects of these conditions and medications on Gerhardt, stating that Gerhardt had

> been totally disabled since the year 2000. . . . While not every day does Ms. Gerhardt find herself bed ridden, her disease is unpredictable and hard to manage, stress is one of the offenders as well as taking the patient out of her routine, this increases her flare ups, and the severity of these flare ups. It then becomes a cycle of attempts to return Ms. Gerhardt to days without bed rest. She will continue to need these medications and she cannot work safely under the influence of these medications, in addition to her physical and mental impairments.

(Adm. R. 446-47.) The medications Gerhardt was taking at that time included hydrocodone, methylin, and Cymbalta. (Adm. R. 446.) She wrote further,

> Ms. Gerhardt's medication has side effects such as sedation, impairment in concentration and thinking. She has marked restriction of maintaining social function, concentration, persistence, or pace. [H]er medical record indicates [a] history of marked decompensation of extended duration, continuous and intermittent depression syndrome, with anhedonia, appetite disturbance with weight loss, sleep disturbance, decreased energy, feelings of guilt and worthlessness as a result of her physical and mental impairments, difficulty concentrating and thinking. . . . In conclusion I feel Ms. Gerhardt is totally disabled and cannot perform full time employment or part time employment regardless of restrictions or activity level. [Adm. R. 447.]

On April 6, 2006, Michael Grady, a physical therapist, performed a functional capacity evaluation on Gerhardt. Grady evaluated Gerhardt for approximately two hours and thirty-five minutes. He noted that Gerhardt was able to fill out all paperwork "with use of normal grip for writing observed with occasional use of shaking right hand . . . . Weakness with muscle tests

included increase in heart rate but client did not report any significant increase in pain with resistance.  Suggestions for adaptive equipment to use with writing include assistive grip devices around pens and pencils, voice activation system for extended periods of typing, headsets for telephone use and an appropriate work site evaluation by a qualified physical therapist." (Adm. R. 385.)  Grady also reviewed surveillance videos of Gerhardt in which she was seen walking to and from her car with a normal gait, driving, rotating the trunk of her body in her car, carrying a purse, buying fast food at a drive through, and pushing a grocery cart, among other activities.  (Adm. R. 385-86.)  Grady did note that he was unaware whether the days of video taping took place on Gerhardt's "good" days, which may have enabled her to perform these activities, or on an "average" or "bad" day.  (Adm. R. 386.)  Ultimately, Grady concluded that Gerhardt was capable of performing sedentary work.  (Adm. R. 383.)

According to Liberty's claim notes, on or about April 26, 2006, Jason Miller performed a transferable skills analysis update subsequent to the functional capacities evaluation.  Although no copy of a report appears to be in the administrative record, Liberty's claim notes include the following statements:

> In her TSA, Ms. Marques identified five occupations that would be transferable: community health/program director (EE's own occupation), nurse case manager, utilization review nurse, health services coordinator, and ambulance/emergency service dispatcher.  With a reasonable degree of vocational certainty, the physical demands of all of these occupations remain consistent with the physical capacities as outlined in the functional capacity evaluation.  Wages are also accurate and remain the same.  A headset and pen/pencil grip are considered standard equipment offered in the majority of jobs where writing and telephonic work are significant.  As for voice activated software, the therapist indicated that this would be needed for extended periods of typing.  However, typing in these occupations would be required on an occasional to frequent basis and, as EE has demonstrated this capacity in the evaluation, there does not need to be a need for this software.

14

(Adm. R. 770.)

On May 1, 2006, Liberty wrote Gerhardt to inform her that it had determined that she was no longer prevented from performing the material and substantial duties of any occupation and therefore was no longer eligible for long-term disability benefits.  (Adm. R. 400-06.)  Gerhardt appealed that determination.  (Adm. R. 919-28.)

Subsequent to Liberty's termination of Gerhardt's benefits, Gerhardt obtained several additional medical examinations.  On July 5, 2006, Dr. Marcia Hixson, an orthopedic physician specializing in the hands and upper extremities, found that: (1) Gerhardt's right thumb had an adduction deformity at the CMC joint with slight compensatory MP hyperextension; (2) Gerhardt had good intrinsic hand strength, including a grip strength of forty-two pounds in the right hand and twenty-one pounds in the left hand; (3) Gerhardt had Phalen's maneuver that caused numbness and tingling in the right ring and little fingers and in the left index finger, middle finger, and thumb; and (4) Gerhardt had chronic problems with her upper extremities, including pain at the base of her thumbs and numbness and tingling in the hands.  (Adm. R. 930.)  Also on July 5, 2006, Dr. James Tucker, an orthopedic spine physician, examined Gerhardt.  Tucker noted that Gerhardt had limited range of motion of the cervical spine.  Tucker was also concerned that Gerhardt had a herniated disc that appeared to be a radicular problem.  He ordered an MRI to aid in the diagnosis.  (Adm. R. 932.)

On July 6, 2006, Gerhardt underwent an MRI of her cervical spine.  Dr. David Tamas wrote in the MRI report that there was prominent degenerative disc change at C5-C6 eccentric toward the left where there may have been some impingement of the left C6 nerve root.  (Adm. R. 933.)  Tucker reviewed the MRI and found that it showed a "significant foraminal stenosis problem at C5-6 secondary to a disc herniation."  Tucker referred Gerhardt to Dr. Ken Rosenzwieg for possible

epidural steroid injections.  (Adm. R. 934.)  On July 21, 2006, Rosenzwieg stated that Gerhardt should not return to work until further notice, stating that she had spinal stenosis and possible myelopathy.  (Adm. R. 929.)

Liberty then referred Gerhardt's claim to Dr. Jack Denver for an independent peer review. Denver did not meet with or examine Gerhardt, but rather merely reviewed her medical file.  He spoke with Suphan on August 29, 2006.  According to Denver's records, "Suphan acknowledged that sedentary duty with change of position might allow adequate tolerance for her to engage in some work activities. . . . [Suphan] felt that the information on the video surveillance did not adequately reflect the patient's ability to perform these activities persistently and at length, which may be required in a work-type situation. [Suphan] felt that poor pain tolerance was the primary reason for [Gerhardt's] inability to resume working."  (Adm. R. 880-81.)  Denver found support in the medical evidence for the following diagnoses: osteoarthritis, depression, fibromyalgia, mild spondylolisthesis at L5-S1, osteoperosis, and mild left hip osteoarthritis.  He found no evidence to support polyneuropathy, polymyositis, synovitis, or inflammatory bowel disease.  (Adm. R. 881.)  Denver concluded that none of the physical limitations precluded Gerhardt from performing sedentary work. (Adm. R. 881-82.)  Based on Gerhardt's ability to function in the surveillance videos and on the lack of evidence in Gerhardt's medical file regarding cognitive deficits resulting from side effects of medication, Denver concluded that the prescribed medications did not support further impairment regarding Gerhardt's functional capacity.  (Adm. R. 882-83.)

According to Liberty's claim notes, on or about September 26, 2006, David Carey performed a second update to Marques's transferable skills analysis report based on Denver's assessment regarding Gerhardt's functional capacity.  Carey found that Gerhardt could perform all of the

previously identified occupations.  Carey was specifically asked to identify which of the five occupations did not require a nurse's license, as Gerhardt's license had elapsed since she stopped working.  Carey was unsure whether a license was required to perform the community health/program director and health services coordinator occupations.  A license would be required for the nurse case manager and utilization review nurse occupations.  A registered nurse license is not required to perform the ambulance/emergency service dispatcher occupation.  (Adm. R. 762-63.)

On October 4, 2006, Hartford wrote another letter to Gerhardt, again denying her claim and stating, "At this time, your administrative right to review has been exhausted and no further review will be conducted by Liberty and your claim will remain closed."  (Adm. R. 865-870, 897.)  On November 3, 2006, Gerhardt commenced this action.

## II.

Section 502(a)(1)(B) of ERISA provides that "a participant or beneficiary" may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan . . . ." 29 U.S.C. § 1132(a)(1)(B).  "ERISA provides a plan beneficiary with the right to judicial review of a benefits determination." *Norris v. Citibank, N.A., Disability Plan (501)*, 308 F.3d 880, 883 (8th Cir. 2002).  Although ERISA contains no standard of review, the Supreme Court has held that a reviewing court should apply a *de novo* standard of review unless the plan gives the "administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57, 103 L. Ed. 2d 80  (1989).  The Eighth Circuit requires "express discretion-granting language" different from the common proof-of-loss provisions usually found in insurance policies. *Brown v. Seitz*

17

*Foods, Inc., Disability Benefit Plan*, 140 F.3d 1198, 1200 (8th Cir. 1998).

As previously mentioned, the plan here includes a provision equipping the administrator with such discretion: "Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder." (Adm. R. 845.) Gerhardt contends that here, Universal was the plan administrator and sponsor and that according to the plan, "The Plan Administrator and Sponsor have the authority to control and manage the operation and administration of the plan." Because the plan does not grant Universal discretionary authority, according to Gerhardt, de novo review is proper because Universal could not delegate to Liberty discretionary authority that it did not have. However, federal case law specifically provides that de novo review is proper unless the plan gives the "administrator *or* fiduciary discretionary authority to determine eligibility for benefits . . . ." *Firestone*, 489 U.S. at 115, 109 S. Ct. at 956-57 (emphasis added). Here, Liberty is a fiduciary, and the plan gives it authority to determine Gerhardt's eligibility for benefits and construe the terms of its long-term disability benefits plan.

Gerhardt also argues that the discretion-granting language must come in the governing plan. Here, the plan governing Gerhardt's eligibility for long-term disability benefits is Liberty's plan, and such discretionary language is explicitly located within that plan. The terms of Liberty's policy and the application of those terms to Gerhardt serve as the underlying basis for this dispute. Support for this fact may be drawn from Gerhardt's repeated citations to Liberty's policy terms throughout her brief and argument. Because Liberty is a fiduciary and because the applicable governing plan contains explicit language granting Liberty discretion to determine eligibility and construe the terms of the plan, the proper standard of review is abuse of discretion.

There are some circumstances that can alter the standard of review to either sliding scale

review or de novo review.  Specifically, in order to alter the standard of review, the plaintiff must present material, probative evidence that either a palpable conflict of interest or a serious procedural irregularity existed, which caused a serious breach of the plan administrator's fiduciary duty to the plaintiff.  *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1160 (8th Cir. 1998).  Gerhardt contends that these circumstances exist here.  This Court has previously considered this argument and ruled that neither a palpable conflict of interest nor a serious procedural irregularity existed.  Docket No. 22.  Thus, the proper standard of review remains abuse of discretion.

Nevertheless, this Court will not rubberstamp a decision to terminate benefits even under the deferential standard of review.  Under the abuse of discretion standard, the proper inquiry is whether Liberty's decision was reasonable, that is, whether it was supported by substantial evidence.  *Ortlieb v. United HealthCare Choice Plans*, 387 F.3d 778, 781 (8th Cir. 2004).  Substantial evidence is "more than a scintilla but less than a preponderance."  *Smith v. Unum Life Ins. Co. of America*, 305 F.3d 789, 794 (8th Cir. 2002).  "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Fletcher-Merritt v. NorAm Energy Corp.*, 250 F.3d 1174, 1179 (8th Cir. 2001).  An administrator's decision is reasonable if a reasonable person could have reached a similar decision, given the evidence in the record, not whether the reasonable person would have reached that decision.  *Ferrari v. Teachers Ins. and Annuity Ass'n*, 278 F.3d 801, 807 (8th Cir. 2002).  Under this standard, the Court should ordinarily consider only evidence that was before Liberty when the claim was denied.  *Farfalla v. Mut. of Omaha Ins. Co.*, 324 F.3d 971, 974-75 (8th Cir. 2003).  Gerhardt argues that the Court should consider additional evidence outside the administrative record in this case, and the Court addresses this argument below.

19

## III.

Gerhardt contends that Liberty's decision was unreasonable because it relied on the conclusion reached Dr. Baskin, Dr. Safman, Grady, and Dr. Denver that Gerhardt could perform full time sedentary work rather than Dr. Suphan's assessment that Gerhardt could not perform full time sedentary work. Contrary to Gerhardt's argument, there is substantial evidence in the record to show that Gerhardt's physical impairments alone did not prevent her from being able to perform any occupation as defined by the policy and with the limitations indicated on Marques's transferable skills analysis report on October 17, 2005.

Gerhardt acknowledges that plan administrators are not obliged to accord special deference to the opinions of treating physicians. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825, 123 S. Ct. 1965, 1967, 155 L. Ed. 2d 1034 (2003). However, Gerhardt contends that not only did Liberty not give Gerhardt's treating physician, Dr. Suphan, special deference, Liberty gave no consideration to Suphan's recommendations whatsoever. Gerhardt argues that it was only reasonable to agree with Suphan's assessment of Gerhardt's functional capacities because Suphan met with Gerhardt on many occasions over a multi-year period whereas Baskin, Safman, and Grady each only examined Gerhardt once and neither Denver nor Marques ever personally met Gerhardt. By Gerhardt's rationale, the only way Liberty could have given Suphan's recommendations proper consideration would have been to follow them to the exclusion of any other doctor's unless that doctor was also a treating physician. The fact that Baskin, Safman, and Grady only each examined Gerhardt once does not automatically render their professional medical opinions unreasonable, nor does it render Liberty's reliance on their opinions unreasonable. Gerhardt is essentially asking the Court to weigh the evidence in the record, which it cannot do. Rather, the Court must examine the

record to determine if substantial evidence exists to support Liberty's decision.  While Gerhardt

disagrees with Liberty's conclusions with respect to her physical ability to perform sedentary work,

Liberty's decision in that regard is supported by substantial evidence in the record – three doctors,

Baskin, Safman, and Denver, and one physical therapist, Grady, each separately concluded that

Gerhardt could perform sedentary duties on a full time basis (i.e. with reasonable continuity) – and

is not an abuse of discretion.

Gerhardt also argues that Liberty failed to properly address whether she could perform the

substantial duties of any occupation for which she is reasonably fitted by mental capacity as required

by the policy.  In response to this argument, Liberty argues that "[t]hree doctors, a physical therapist,

and a vocational consultant have all determined that Gerhardt has the mental capacity to perform

full-time sedentary work."  The record does not support Liberty's contention.  Presumably, Liberty

is referring to Baskin, Safman, Denver, Grady, and Marques.  In Baskin's report, he wrote,

"[Gerhardt] has had a long history of depression. . . . Notes from October 2001 revealed that the

patient was seen by Dr. Puru Thapa, a psychiatrist, and diagnosed with depressive disorder . . . . She

does have . . . chronic fatigue, concentration problems and some associated ADHD . . . . She does

manifest signs and symptoms of depression and the Zoloft is appropriate, although she is taking a

large dose. . . . I don't know what her current restrictions and limitations are . . . ."  (Adm. R. 685,

687, 689-91.)  Dr. Safman specifically stated that Gerhardt "has significant depression and anxiety

. . . [and that] her impairment would evolve from short-term memory problems, chronic fatigue, and

overall generalized pain, which would restrict her ability to participate in . . . cognitive demanding

activities."  (Adm. R. 474, 481.)  Denver wrote that a diagnosis of depression was supported by the

medical evidence on file.  When asked to describe how that impairment translated to restrictions and

limitations, he wrote, "Restrictions and limitations based on this diagnosis are deferred to the appropriate specialist." (Adm. R. 881.) Grady, a physical therapist, is not qualified, nor did he make an attempt, to determine the effect of Gerhardt's potential cognitive deficits on her ability to maintain employment.  At no point in Grady's report did he comment on Gerhardt's mental health or abilities; rather, he discussed her ability to walk, sit, stand, push, pull, twist her trunk, reach, etc.  (Adm. R. 382-98.)  Marques actually wrote in bold that she made no attempt to include Gerhardt's mental capacity in her transferable skills analysis because no neuropsychological evaluation had been done. (Adm. R. 536.)  Thus, Baskin and Grady made no specific comment on the restrictions or limitations that could result from possible cognitive deficits; Denver and Marques actively deferred such determinations to mental and neuropsychological specialists; and Safman specifically stated that her ability to participate in cognitively demanding activities was restricted.

Liberty further argues that Gerhardt did not have any neuropsychological evaluation to determine to what extent she had any cognitive deficits and that generalized statements by Suphan that she suffered from "depression," "anxiety," or "fatigue" are not evidence of disability.  Liberty goes on to say that it is under no duty to provide health care or health care advice to Gerhardt, and there is a lack of medical evidence in the record to support Gerhardt's subjective complaints of her lack of cognitive ability.

Liberty is correct that it is not necessarily an abuse of discretion to deny a claim because of a lack of objective medical evidence to support a finding of disability.  *See Johnson v. Metro. Life Ins. Co.*, 437 F.3d 809, 813 (8th Cir. 2006); *Pralutsky v. Metro Life Ins. Co.*, 435 F.3d 833, 839 (8th Cir. 2006).  Liberty also correctly notes that it is under no duty to provide treatment to Gerhardt under the policy and rather that Gerhardt is obligated to provide proof of her disability upon request

from Liberty.  However, Liberty's letter terminating Gerhart's benefits was required to include:

(i) The specific reason or reasons for the adverse determination;

(ii) Reference to the specific plan provisions on which the determination is based;

(iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;

(iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review[.]

29 C.F.R. § 2560.503-1(g).  Neither Liberty's initial benefit termination letter to Gerhardt nor its termination later after Gerhardt's appeal notifying her of the adverse determination described any additional material or information necessary for Gerhardt to perfect her claim.

The initial decision to terminate followed the assessments of two different physicians, Drs. Suphan and Safman, who concluded that Gerhardt's functional abilities in the workplace would be limited by her mental capacity.  It also followed Marques's bold writing that stated that mental or cognitive impairments were not a factor in her transferable skills analysis because of the lack of a neuropsychological exam.  Further, there is ample evidence in the record that Gerhardt has been taking a substantial amount of anti-depressant medication, including both Zoloft and Cymbalta, for many years.  (Adm. R. 6, 68, 76, 127, 512, 686, 980.)  In Liberty's first termination letter, the only mention of Gerhardt's mental abilities came in the midst of lengthy quotes from Gerhardt's doctors who had examined her, specifically Baskin's comment that Gerhardt suffered from chronic fatigue, concentration problems, and ADHD, Safman's comment that Gerhardt's ability to participate in cognitively demanding activities was limited, and Suphan's comment that Gerhardt suffered from

severe depression.  (Adm. R. 401, 403, 405.)

Liberty's final termination letter following Gerhardt's appeal stated, "On April 6, 2006, the FCE concluded you have sedentary *physical* capacity. . . . On April 26, 2006, a transferable skills analysis was completed by a vocational specialist, based upon your sedentary *physical* capacity . . . . The vocational specialist concluded the *physical* demands of the following occupations are consistent with your *physical* capacities . . . ."  (Adm. R. 868 (emphasis added).)  Nowhere did the letter address whether the mental demands of those occupations were consistent with Gerhardt's mental capacities, because no such analysis was ever performed, at least according to the record.  Liberty did write, "Regarding your treatment for depression, your claim file does not contain evidence of mental status evaluations or test results to assess the severity of this condition, therefore we are unable to consider restrictions and limitations in relation to it as of the May 5, 2006 denial of benefits."  (Adm. R. 870.)  While this portion of the letter did acknowledge the lack of evidence regarding Gerhardt's mental health status, it did not describe what additional material or information was necessary for Gerhardt to perfect her claim.  Because this discussion came in Liberty's final termination letter rather than its initial termination letter, it also did not give Gerhardt the proper opportunity to perfect her claim in an appeal process as required by 29 C.F.R. § 2560.503-1(h)(2).

In *Abram v. Cargill, Inc.*, 395 F.3d 882, 887 (8th Cir. 2005), the court held that a reviewing court must remand a case when a plan administrator fails to make adequate findings or explain the rationale for its decision.  There, the plan administrator failed to consider the plaintiff's obesity and her Post Polio Syndrome.  *Id.*  Here, Liberty's policy specifically includes mental capacity as a factor that determines whether a claimant is reasonably fitted to perform the substantial duties of any occupation.  According to the record, two doctors, Suphan and Safman, indicated that Gerhardt's

functional ability in a job was restricted by her cognitive abilities; no doctor stated that Gerhardt was mentally capable of performing any job on a full-time basis; neither Marques nor anyone else included Gerhardt's mental abilities in a transferable skills analysis to determine what jobs in the marketplace Gerhardt was mentally capable of performing; and Liberty's termination letters did not adequately describe how Gerhardt could perfect her claim, nor did they give her a proper opportunity to do so.   Therefore, the Court will remand this case to Liberty for further consideration of Gerhardt's claim.

Because the case is remanded without reference to Gerhardt's second supplemental brief, Liberty's motion to strike that brief is denied as moot.  Nevertheless, on remand, Liberty should consider all pertinent evidence relevant to Gerhardt's physical ability to perform the substantial duties of any occupation with reasonable continuity.  The ERISA regulations do not call for a plan administrator or fiduciary to determine whether their own review was accurate as of the initial benefit termination date, but rather to "[p]rovide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." 29 C.F.R. § 2560.503-1(h)(2)(iv).  Therefore, Liberty should focus less on what Gerhardt's condition was as of May 5, 2006, and more on what evidence Gerhardt has brought forth during her appeal, taken in context with the prior record, and determine whether that evidence satisfies the policy's eligibility and proof of disability requirements and thereby entitles Gerhardt to receive benefits under the plan.

Liberty should also give greater consideration on remand to the side effects, both physical and mental, of Gerhardt's medications.  References to various medications Gerhardt has taken are

littered throughout the record.  These medications include Avinza, Azulfidine, Celebrex, Cymbalta, Duragesic Patch, Fosamax, Hydrocodone, Lorcet, Lortab, Mepergan, Methadone, Methotriat, Methylim, Ritalin, Soma, Trazodone, Vioxx, Zoloft, and others.  At one point, Suphan specifically stated that Gerhardt "will continue to need these medications and she cannot work safely under the influence of these medications . . . ."  (Adm. R. 447.)  Baskin took into consideration all of the medications Gerhardt was taking when he examined her, and stated that her use of narcotics could be tapered down, the Zoloft was appropriate although in a large dosage, and not much else.  (Adm. R. 686, 690.)  Safman stated that Gerhardt had been on numerous medications but named only one, Methadone.  (Adm. R. 475-76.)  Marques also named only one medication, Trazodone, in her transferable skills analysis report and made no other mention of how or whether potential side effects of her medications would affect her employability skills.  (Adm. R. 535.)  While Grady made no mention of Gerhardt's medications, that was appropriate given that he was a physical therapist performing a functional capacities evaluation.

Denver did specifically address the affect the medications may have on Gerhardt's cognitive ability and concluded that "the available medical evidence does not support that as of May 5, 2006, that any prescribed medications support further impairment impacting her functional capacity."  As previously noted, however, Denver did not meet with or examine Gerhardt.  Rather, he based his conclusion on the surveillance video showing Gerhardt driving and grocery shopping and on a lack of mention in the record as to what Gerhardt's side effects were and the lack of clarity in the record as to how these side effects impact her functional capacity.  (Adm. R. 882-83.)  Additionally, Gerhardt contends that Denver did not have a full and complete set of her pharmacy records, and his analysis was therefore incomplete.  On remand, it would be appropriate for a doctor to examine

Gerhardt, determine what medications are currently necessary, and further assess how the physical and mental side effects from those medications actually affecting Gerhardt (rather than potential side effects) impact her functional ability.  At the very least, Liberty should inform Gerhardt that this information is necessary to perfect her claim and provide her with an opportunity to do so.

As it does with mental capacity, Liberty's definition of disability specifically states that Gerhardt is not disabled only if she can perform the substantial duties of any occupation for which she is reasonably fitted by age.  Marques did mention Gerhardt's age in the introduction of her report.  (Adm. R. 535.)  However, Marques never again specifically mentioned Gerhardt's age – which was fifty-two at the time of Marques's report and is fifty-four now – and whether it would have any impact on Gerhardt's ability to take one of the jobs identified by Marques.  Social Security regulations state that

> Individuals approaching advanced age (age 50-54) may be significantly limited in vocational adaptability if they are restricted to sedentary work.  When such individuals have no past work experience or can no longer perform vocationally relevant past work and have no transferable skills, a finding of disability ordinarily obtains.  However, recently completed education which provides for direct entry into sedentary work will preclude such a finding.  For this age group, even a high school education or more (ordinarily completed in the remote past) would have little impact for effecting a vocational adjustment unless relevant work experience reflects use of such education.

20 C.F.R. pt. 404, subpt. P, app. 2, § 201.00(g).  Although not binding in an ERISA context, the regulation nevertheless is informative with regard to Gerhardt's ability to adapt to an occupation other than her own at her age.  Thus, on remand, Liberty should more thoroughly consider how Gerhardt's age affects her ability to work in one of the new occupations identified by Marques in her report.

Lastly, aside from the issues already mentioned, Marques's transferable skills analysis

properly determined what occupations Gerhardt was reasonably fitted for by training, education, and experience, in spite of Gerhardt's arguments to the contrary.  However, it appears that Gerhardt is currently precluded from taking at least two of the jobs identified by Marques and possibly four due to the loss of her nurse's license.  Liberty noted that the policy language indicates that "a loss of a license for any reason does not, in itself, constitute Disability."  (Adm. R. 831.)  While this may be true, the language "in itself" suggests that the fact of a lost license is to be taken into context with other factors.  Here, Marques was unaware that Gerhardt had lost her license when she performed the original transferable skills analysis.  Although Liberty took this fact into consideration in an update, Liberty is only certain that one of the five occupations does not require a nurse's license and noted that a labor market survey needs to be completed to determine if a license is required for two of the occupations.  Thus, Gerhardt cannot currently work in at least two and up to four of the five occupations identified by Marques, and the updates identified no additional occupations for which Gerhardt was reasonably fitted by training, education, and experience.  Thus, on remand, it would be advisable to obtain a new transferable skills analysis report that contemplates Gerhardt's lack of a nurse's license and also specifically considers her age, mental capacity, and the side effects of her medications.

Lastly, Gerhardt correctly notes that

The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated.

29 U.S.C. § 1024(b)(4).  Gerhardt also correctly notes that the Court, in its discretion, may impose a penalty on Liberty for failure to furnish the above records within thirty days.  29 U.S.C.

§ 1132(c)(1).  Here, Liberty's attorney states that while Liberty did not produce all requested records within thirty days of Gerhardt's request, it asked for an extension to produce the records to which Gerhardt did not object.  Liberty then furnished all records within the extension period.  Liberty also states that there was no trust agreement to produce, and that, while it did not furnish the annual report, Gerhardt had full access to the report at all times on the internet and Gerhardt's attorneys made no additional requests for the report after Liberty had furnished all the documents it believed Gerhardt had requested.  In these circumstances, penalties are not appropriate.  Thus, Gerhardt's request for penalties is denied.

## CONCLUSION

For the reasons stated above, the decision of Liberty Life Assurance Company of Boston determining that Lisa Gerhardt was no longer eligible for long-term disability benefits is reversed, and the claim is remanded for further proceedings consistent with this opinion.  Liberty must consider not only Gerhardt's physical impairments, but also her mental impairments, the side effects of any necessary medications, her age, and other considerations contained in the administrative record.  The parties should also consider obtaining a new transferable skills analysis report.  Liberty's motion to strike Gerhardt's second supplemental brief is denied as moot because it was not necessary for the Court to consider the brief.  Gerhardt's request for penalties is denied.  Document #50.

IT IS SO ORDERED this 17th day of June, 2008.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE