## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

LISA GERHARDT                                                                          PLAINTIFF

v.                                    No. 4:06CV01595 JLH

LIBERTY LIFE ASSURANCE COMPANY
OF BOSTON; UNIVERSAL HEALTH
SERVICES, INC.; UHS OF DELAWARE, INC.;
and BRIDGEWAY, INC.                                                                    DEFENDANTS

### OPINION AND ORDER

Lisa Gerhardt commenced this action under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.*, against Liberty Life Assurance Company of Boston, Universal Health Services, Inc., UHS of Delaware, Inc., and The Bridgeway, Inc.  Gerhardt sought review of an adverse disability benefits determination by Liberty, the Claims Administrator under the ERISA plan sponsored by Universal Health.  The Court found that substantial evidence supported Liberty's determination that Gerhardt's "physical impairments alone did not prevent her from being able to perform any occupation as defined by the policy and with the limitations indicated on" her transferable skills analysis report.  Document #55 at 20.  However, the Court concluded "that Liberty failed to properly address whether [Gerhardt] could perform the substantial duties of any occupation for which she is reasonably fitted by mental capacity as required by the policy."  *Id.* at 21.

Consequently, the Court remanded the matter.  Pursuant to the regulations concerning the review of an adverse determination, *see* 29 C.F.R. § 2560.503-1(h), the Court directed Liberty to "focus less on what Gerhardt's condition was as of May 5, 2006, and more on what evidence Gerhardt has brought forth during her appeal, taken in context with the prior record, and determine whether that evidence satisfies the policy's eligibility and proof of disability requirements and thereby

entitles Gerhardt to receive benefits under the plan." Document #50 at 25. Furthermore, the Court instructed Liberty to "consider all pertinent evidence relevant to Gerhardt's physical ability to perform the substantial duties of any occupation with reasonable continuity." *Id.* The Court also instructed Liberty to consider the effects of Gerhardt's medications, age, and loss of RN license. *Id.* at 25-28.

After an unsuccessful appeal, Liberty began reviewing its prior benefits determination in January of 2010.[1] A.R. 2008. Liberty subsequently issued a letter ruling, dated August 30, 2010, affirming its determination that the medical evidence no longer supported finding Gerhardt to be disabled, within the meaning of the plan, in 2006. A.R. 1474-81. Gerhardt notified Liberty that she wished to administratively appeal the ruling. Liberty maintained that the applicable ERISA regulations did not require an administrative appeal because the ruling was not an adverse determination. Nevertheless, Liberty ultimately relented and permitted Gerhardt to file an administrative appeal. On February 8, 2011, Liberty issued a second letter ruling again finding that Gerhardt was not disabled in 2006. A.R. 1363-70.

Upon Gerhardt's motion, the Court reopened the instant action. Document #100. Gerhardt has moved for judgment on the record, document #119, and the parties have filed their briefs. For the following reasons, Liberty's decision to terminate Gerhardt's long-term disability benefits is affirmed.

## II.

In its prior opinion and order, document #55 at 1-17, the Court thoroughly discussed the relevant facts contained in the record before remand. Therefore, only those facts added to the record

---

[1] The defendants appealed the Court's prior opinion and order, Document #61, but the Eighth Circuit concluded that it lacked jurisdiction and dismissed the appeal, Documents #73, #74.

after remand will be narrated in detail herein.  Suffice to say, Gerhardt was a licensed registered nurse who performed a number of jobs in the medical industry from 1981 to 2000.  She ceased working in 2000 because she was suffering from osteoarthritis in both hands and required bilateral basal joint arthroplasty of both thumbs.  She sought, and was granted, social security benefits from the Social Security Administration.  Similarly, she sought long-term disability benefits under the ERISA plan sponsored by Universal Health.  Liberty approved her application, and Gerhardt began receiving benefits.  Liberty continued to pay disability benefits to Gerhardt until May of 2006.  Liberty then ceased paying benefits to Gerhardt based on its determination that the medical evidence no longer supported her claim that she was disabled under the plan.

## A.    New Medical Evidence

In May of 2007, Dr. Marcia Hixon performed x-rays showing that Gerhardt had "moderately severe osteoarthritis" in her right hand.  A.R. 2346.  In November of 2007, an MRI of Gerhardt's cervical spine revealed degenerative disc disease and uncovertebral osteophytes.  A.R. 2791-92.  Dr. Amir Qureshi diagnosed Gerhardt with cervical myelopathy, severe cervical foraminal stenosis, and cervical radiculopathy.  A.R. 2793-94.  Gerhardt notes that the findings of the MRI performed in November of 2007 were consistent with a July of 2006 study finding "prominent degenerative disc change[.]"  A.R. 2868.

In September of 2008, Dr. Victor Vargas diagnosed Gerhardt with moderate to advanced arthritis in her left hip requiring a total hip arthroplasty.  A.R. 2895-96.  Subsequently, in April of 2010, Dr. Scott Brown diagnosed Gerhardt with left hip osteoarthritis, and concluded that she ultimately faced a hip replacement.  A.R. 1599.

In June of 2010, Dr. Patricia Knott performed an independent medical evaluation on Gerhardt. A.R. 1612-30.  Dr. Knott concluded that, from May of 2006 to October of 2006, Gerhardt "should be able to work at a full-time capacity" at the sedentary level with certain limitations.  A.R. 1630. Dr. Knott also concluded that Gerhardt's capacity was probably greater than that reported in the April of 2006 functional capacity report.  A.R. 1621-22, 1628.  Dr. Knott stated that Gerhardt should be restricted to occasional sitting, standing, and walking in fifteen minute increments; occasional driving; lifting and carrying no more than ten pounds; occasional pushing or pulling; seldom climbing; no work at heights; occasional bending or twisting; no crouching, kneeling, or crawling; occasional reaching and repetitive hand motions; and frequent fine finger manipulation.  A.R. 1629-30.  Dr. Knott also stated that, if Gerhardt had hip surgery, then some of her restrictions could likely be further relaxed.  A.R. 1630.  Dr. Knott observed that a number of Dr. Suphan's diagnoses of Gerhardt were unsupported by objective testing.  A.R. 1614.  About one month later, Dr. Knott authored an addendum to her evaluation in which she stated that Gerhardt could not stand or walk for more than fifteen minutes at a time and would need to sit for fifteen minutes between occasions of standing or walking.  A.R. 1582.  In response to a question specifically addressing Gerhardt's cognitive limitations, Dr. Knott reiterated her conclusion that Gerhardt could have worked at a sedentary level from May of 2006 until October of 2006.

In July of 2010, Margaret West diagnosed Gerhardt with "erosive moderate to severe rheumatoid arthritis."  A.R. 1588.  Dr. West prescribed Methotrexate Sodium and Plaquenil.  *Id.* That same month, Dr. Robert Cheek also diagnosed Gerhard with rheumatoid arthritis.  A.R. 1503. In October of 2010, Dr. Rachel Wayne observed evidence of rheumatoid arthritis, and adopted

Dr. West's prescriptions.  A.R. 1452.  A bone density scan performed that month revealed that Gerhardt's bone density was below normal and worse than in 2000.  A.R. 1447.

In October of 2010, Dr. Barry Baskin wrote an evaluation report discussing Gerhardt's medical condition.  A.R. 1443-46.  Dr. Baskin had previously authored an evaluation of Gerhardt in 2004.  A.R. 685-93.  In the 2010 report, Dr. Baskin stated that Gerhardt's "medical diagnoses have changed since [he] saw her originally in 2004 and her condition has deteriorated."  A.R. 1446.  Dr. Baskin concluded that Gerhardt would not be able to hold down even a part-time, sedentary position because of her multiple diagnosis through 2010.  *Id.*  He observed, "[b]ased on my evaluation today, I do not see any way that this lady could resume working, even at a sedentary level."  *Id.*  Dr. Baskin stated that his views were based on Gerhardt's medical records and his in-person evaluation of her on October 26, 2010.  *Id.*

In January of 2011, Dr. Phillips Marion authored a peer-review report of Gerhardt's medical condition from March of 2006 to October of 2006.  A.R. 1371-80.  Dr. Marion concluded that Gerhard suffered from "no objective neurological deficits" and that there were no "reported adverse cognitive deficits as a result of [Gerhardt's] prescribed medications."  A.R. 1378.  Dr. Marion also found that Gerhardt's "objective impairments did not support the level of her self reported occupational/functional incapacity."  A.R. 1380.  Dr. Marion concluded that "[f]rom a physical medicine and rehabilitation/pain management perspective, there remains no objective impairment precluding Ms. Gerhardt from performing the full-time activities of a sedentary occupation[.]"  *Id.*

**B.      Evidence of Employability**

In March of 2010, Sarah Moore, a certified rehabilitation counselor, authored an employability assessment report on Gerhardt's behalf.  A.R. 2153-63.  Moore concluded that Gerhardt's physical and cognitive limitations precluded her from performing any of the occupations identified in the transferable skills reports created prior to the initial litigation.  A.R. 2160-61.  Specifically, Moor found that the occupations of radio dispatcher, utilization review coordinator, and case manager require more frequent reaching than Gerhardt could perform according to her functional capacity evaluation.  Additionally, Moore found that all the identified positions, except radio dispatcher, required either a bachelor's degree or RN license.  A.R. 2161.  Moore also found that Gerhardt's memory and concentration precluded her from performing semi-skilled work, and that the only identified unskilled job that fell within Gerhardt's capacity did not exist in sufficient numbers in Arkansas or the United States.  *Id.*

In August of 2010, Teresa Marques, a vocational rehabilitation, authored an updated transferrable skills analysis report wherein she stated that Gerhardt, based on her medical condition in 2006, could reasonably be expected to work in the sedentary occupations of Community Health/Program Director, Nurse Case Manager, Utilization Review Nurse, Precertification Nurse, Telephone Triage Nurse, Health Services Coordinator, and Ambulance/Emergency Service Dispatcher.  A.R. 1487-88.

In October of 2010, Moore authored a supplemental employability assessment report.  A.R. 1414-19.  Therein, Moore concluded that Gerhardt could not perform any of the occupations identified in Marques' report.  Specifically, Moore found that the Nurse Case Manager, Utilization Review Nurse, Precertification Nurse, Telephone Triage Nurse, and Ambulance/Emergency Service

Dispatcher positions required frequent reaching, while Gerhardt's functional capacity evaluation limited her to occasional reaching.  A.R. 1417.  Moore found that the Community Health/Program Director position was too mentally and physically demanding for Gerhardt, and that the Health Services Coordinator position constituted light rather than sedentary work.  A.R. 1416-17.  Moore stated further that, if Gerhardt did find a position, she would likely eventually be terminated if she had as few as one to two unscheduled absences every month.  A.R. 1418.  Moore reiterated her findings regarding the need for a bachelor's degree or RN license and noted that Gerhardt's advanced age would make it more difficult for her to adjust to different work from the jobs she had performed in the past.  *Id.*

In January of 2011, Marques authored another updated transferable skills analysis confirming her previous findings.  A.R. 1394-1400.  Marques also stated that Moore's findings were inaccurate because they were based on the Dictionary of Occupational Titles which imposed outdated reaching requirements that did not reflect the requirements of the identified occupations as they existed in 2006.  Marques explained that the reaching requirements of these positions had changed based on advances in technology such as the increased use of computers, development of ergonomic work stations, and use of headsets.  A.R. 1395-98.  Additionally, Marques noted that Gerhardt held a degree in nursing but no longer had an active RN license.  A.R. 1398.

## C.    Plan Terms

The Court extensively quoted the relevant plan provisions in its prior opinion and order.  *See* Document #55 at 2-4.  These provisions need not be reiterated here.  Suffice to say, the instant dispute is whether, based on all relevant evidence, Liberty erred in finding that in 2006 Gerhardt was no longer "unable to perform, with reasonable continuity, all of the material and substantial duties of

[her] own or any other occupation for which [she] is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity." A.R. 823.

Benefits are determined on a monthly basis. A.R. 826. Pursuant to the plan, only a "Covered Person" is entitled to disability benefits. A.R. 820, 823. A "Covered Person" is "an Employee insured under this policy." A.R. 823. An "Employee" is "a person in Active Employment with the Sponsor." A.R. 824. "Active Employment" means that "the Employee must be actively at work for the Sponsor" and meet certain other conditions. A.R. 822. The "Sponsor" is "the entity to whom the policy in issued." A.R. 826. The Covered Person ceases to be insured when, *inter alia*, "the Covered Person is no longer in an eligible class[.]" A.R. 842. The eligible classes are composed of officers and employees of the Sponsor, "who are in active employment." A.R. 820.

Disability benefits payable under the plan terminate when the recipient is no longer disabled. A.R. 836. The plan provides that, where a covered person becomes disabled, then ceases to be disabled, then becomes disabled again, the subsequent disability will be treated as part of the prior disability provided that the covered person returns to work for the Sponsor for less than six continuous months during the interim period when she ceased to be disabled. A.R. 838.

### III.

"Where an ERISA plan gives the administrator discretionary power to construe ambiguous terms or make eligibility determinations, the administrator's decision is reviewed for an abuse of discretion." *Hankins v. Standard Ins. Co.*, 677 F.3d 830, 834 (8th Cir. 2012) (citing *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 998-99 (8th Cir. 2005) (en banc).

However, "when[, as here,] the entity that administers the plan 'both determines whether an employee is eligible for benefits and pays benefits out of its own pocket' a conflict of interest exists."

*Chronister v. Unum Life Ins. Co. of Am.*, 563 F.3d 773, 775 (8th Cir. 2009) (quoting *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108, 128 S. Ct. 2343, 2346, 171 L. Ed. 2d 299 (2008)).  Although the presence of a conflict of interest does not alter the abuse of discretion standard of review, the Court must "consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits."  *Glenn*, 554 U.S. at 108, 128 S. Ct. at 2346.  "[T]he significance of the factor will depend upon the circumstances of the particular case."  *Id.*

Even where the administrator is granted discretion by the plan, the Eighth Circuit has held that a less deferential standard of review is warranted if a plaintiff can provide material, probative evidence to demonstrate "that: (1) . . . a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty . . . ."  *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1160 (8th Cir. 1998), *abrogated on other grounds by Glenn*, 554 U.S. 105, 128 S. Ct. 2343.[2]  Under the *Woo* test, the "mere presence of a procedural irregularity is not enough to strip a plan administrator of the deferential standard of review."  *McGarrah v. Hartford Life Ins. Co.*, 234 F.3d 1026, 1031 (8th Cir. 2000), *abrogated on other grounds by Glenn*, 554 U.S. 105, 128 S. Ct. 2343.  The procedural irregularity must also raise "serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim."  *Buttram v. Cent. States Se. & Sw.*

---

[2] *Glenn* abrogated the *Woo* test with respect to conflicts of interest.  *Glenn*, 554 U.S. at 108, 128 S. Ct. at 2346.  It remains to be seen, however, whether *Glenn* affected *Woo's* holding that a procedural irregularity may change the standard of review.  *Compare Wakkinen v. UNUM Life Ins. Co. of Am.*, 531 F.3d 575, 581-82 (8th Cir. 2008) (explaining that, even under *Glenn*, the Eighth Circuit continues to examine procedural irregularities under the two-part *Woo* test), *with Chronister*, 563 F.3d at 776-77 (analyzing procedural irregularities as factors under *Glenn's* abuse of discretion standard).  *See also Wrenn v. Principal Life Ins. Co.*, 636 F.3d 921, 924 n.6 (8th Cir. 2011) (explicitly declining to decide whether *Glenn* changed the *Woo* procedural irregularity test, but noting that *Woo* may still apply in the Eighth Circuit).  This Court will continue to apply *Woo* to procedural irregularities so long as that portion of *Woo* has not been overruled.

*Areas Health & Welfare Fund*, 76 F.3d 896, 900 (8th Cir. 1996). This second requirement is a "considerable hurdle" for plaintiffs. *Torres v. UNUM Life Ins. Co. of Am.*, 405 F.3d 670, 679 (8th Cir. 2005) (quotation omitted). In *Weidner v. Fed. Express Corp.*, the Eighth Circuit emphasized that "procedural irregularities" are "the sorts of external factors that are sufficient under the common law of trusts to call for application of a less deferential standard of review." 492 F.3d 925, 928 (8th Cir. 2007) (quotation omitted).

Gerhardt contends that Liberty committed serious procedural irregularities by failing to consider information that it was required to consider under the relevant ERISA regulations, this Court's prior opinion and order, and the definition of "disability" in the plan. Specifically, Gerhardt contends that Liberty (1) failed to consider Dr. Baskin's finding that Gerhardt was disabled in 2010; (2) failed to consider Dr. Bruce Safman's original independent medical evaluation report; (3) relied on transferable skills analysis reports that were inconsistent with Gerhardt's functional capacity report; (4) failed to consider Dr. Safman's findings that Gerhardt lacked the mental capacity to perform the jobs identified in the transferrable skills analysis reports; (5) failed to consider that Gerhardt lost her nursing license and, consequently, was unable to perform most of the identified jobs; (6) failed to consider that Gerhardt's age changed from "approaching advanced age" to being "of advanced age" when she turned 55 on November 16, 2008; (7) failed to consider the effects of medications, which were prescribed to treat Gerhardt's rheumatoid arthritis, upon her ability to work; and (8) failed to consider evidence that Gerhardt was not able to perform "with reasonable continuity" all material and substantial duties of the identified jobs.

Gerhardt's third reason for imposing a less deferential standard of review is not "procedural" in nature, but rather constitute a disagreement with the weight given to the evidence by Liberty. *See*

*Weidner*, 492 F.3d at 928-29; *cf. Hankins v. Standard Ins. Co.*, 828 F. Supp. 2d 991, 1002 n.10

(E.D. Ark. 2011) (collecting examples of procedural irregularities) *aff'd*, 677 F.3d 830 (8th Cir.

2012); *Bartholomew v. Unum Life Ins. Co. of Am.*, 588 F. Supp. 2d 1262, 1270 (W.D. Wash. 2008)

("The evidence does not support the assertion that the plan administrator 'disregarded' Plaintiff's

evidence, only that Plaintiff's evidence was not considered sufficiently compelling to overturn the

conclusion of the medical experts utilized by Defendant as well as the weight of the other evidence.").

Similarly, Gerhardt's second, fourth, fifth, and eighth alleged procedural irregularities are

probably substantive disagreements rather than procedural errors.  *See Weidner*, 492 F.3d at 928

(finding contention that lesser standard of review was warranted, based on claim that the

administrator failed to consider the opinion of the treating physician, to be "without merit because

[the argument] reflect[s a] substantive disagreement[] with the [administrator]'s analysis of the

administrative record, not procedural irregularities.").   However, the actual failure to consider

relevant medical evidence, as opposed to the mere rejection of such evidence as unpersuasive, may

be a procedural irregularity.[3]  *Cf. Bartholomew*, 588 F. Supp. 2d at 1270.  The regulations provide

that a claims administrator must consider all relevant evidence.  29 C.F.R. § 2560.503-1(h)(2)(iv).

Furthermore, failure to comply with the ERISA regulations can constitute a serious procedural

irregularity.  *See McGarrah v. Hartford Life Ins. Co.*, 234 F.3d 1026, 1031 (8th Cir. 2000) (failure

to comply with regulations is a serious procedural irregularity); *Abatie v. Alta Health & Life Ins. Co.*,

458 F.3d 955 (9th Cir. 2006) (collecting cases noting that violations of ERISA's requirements

---

[3] Because, in *Weidner*, the claims administrator's "denial letter stated that the Committee 'reviewed all information presented including all medical documentation[,]' " it is unclear whether that opinion stands for the proposition that an actual failure to consider relevant medical evidence is merely a substantive, rather than procedural, disagreement.  492 F.3d at 929.

constitutes procedural irregularities); *Hankins*, 828 F. Supp. 2d at 1002-03 n.11 (indicating that a procedural irregularity may exist where the insurer violates a duty imposed by the applicable regulations). *But see Brucks v. Coca-Cola Co.*, 391 F. Supp. 2d 1193, 1202 (N.D. Ga. 2005) (failure to comply with 29 C. F. R. § 2560.503-1(h)(2)(iii) does not affect the standard of review).

Regardless, as in *Weidner*, there is evidence that Liberty *did* consider this medical evidence after remand. Liberty notes, in its initial post-remand denial letter, that Gerhardt "requested that Liberty consider the original 8/8/2005 IME report of Dr. Bruce Safman, and [] submitted a copy of that report." A.R. 1476. Similarly, the letter states that Liberty received Moore's first report. A.R. 1476. Finally, the letter states that "[a]ll additional information received from [Gerhardt] was fully considered in our review" and also provided to an independent physician for review. A.R. 1478-79. Liberty's second post-remand denial letter states that Liberty received Dr. Baskin's report and Moore's second report. A.R. 1366. The second letter states that because "Liberty agreed to conduct an appeal review of the remand determination and consider the additional information [] submitted, Ms. Gerhardt's complete claim file was referred to an" independent physician. *Id.* This medical evidence constitutes the basis of Gerhardt's second, fourth, fifth, and eighth alleged procedural irregularities. Because Liberty's post-remand determination letters indicate that all of this medical evidence was considered, these alleged procedural errors do not merit the imposition of stricter review. *See Weidner*, 492 F.3 at 929; *Bartholomew*, 588 F. Supp. at 1270.

Even if any of these allegations constituted procedural irregularities, it is doubtful that Gerhardt could establish the second element of the *Woo* test. *See Torres* , 405 F.3d at 679 ("We have recognized that this requirement 'presents a considerable hurdle' for plaintiffs, . . . and we are aware of only two cases that have satisfied the second part of the *Woo* test."); *see also Chronister v. Baptist*

12

*Health*, 442 F.3d 648, 655 (8th Cir. 2006) (noting that, in order to strip a plan administrator of deference, a procedural irregularity must be so egregious as to trigger a total lack of faith in the integrity of the decision-making process).

Nor do Gerhardt's first, sixth, and seventh allegations justify departing from the abuse of discretion standard because Liberty did not err in declining to consider the evidence in question. The underlying dispute respecting this evidence is whether Liberty was required to consider evidence added to the record after remand only to the extent that evidence tends to establish that Gerhardt was disabled in 2006, or also to the extent it tends to established that Gerhardt was disabled after 2006.

The Court remanded the case to Liberty for reconsideration of its finding that Gerhardt was no longer disabled in 2006 rather than for a new determination as to whether Gerhardt was disabled thereafter. Nevertheless, Liberty was still obligated to "[p]rovide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." 29 C.F.R. § 2560.503-1(h)(2)(iv). In considering whether Liberty should have considered information generated after the remand, the pertinent inquiry is whether that information was relevant to the claim. Gerhardt's claim is for disability benefits under the plan. The nature of the claim is determined by reference to the terms of the plan. Pursuant to the terms of the plan, Gerhardt was only eligible for benefits so long as she was disabled. A.R. 823, 831. Thus, if Gerhardt ceased to be disabled, she would no longer be eligible for benefits. A.R. 836-37. Furthermore, as Liberty points out and Gerhardt does not deny, the plan provides that if a covered person ceases to be disabled, that person must return to the employ of the sponsor or else she will cease to be covered under the plan. A.R. 820-24, 826, 836, 842. In other words, if Gerhardt ceased to be disabled in

2006, she would not become eligible for benefits under the plan if she thereafter became disabled a second time unless, in the interim, she returned to work for Bridgeway.

Because Gerhardt never returned to work at Bridgeway, her claim depends upon whether she continued to be disabled.  Liberty concedes that Gerhardt may have become disabled a second time in 2010 or possibly earlier, so the only dispute is whether Gerhardt was disabled in 2006.  Because this is the determinative question, post-remand evidence is only relevant to the extent that it tends to show whether Gerhardt was disabled in 2006.  If the evidence does not tend to show that Gerhardt was disabled in 2006, then no amount of evidence tending to establish that she was disabled in subsequent years can save her claim.  *Cf. Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991) (finding, in social security context, that medical evidence is only material to a claim if it is "relevant to the claimant's condition during the time period for which benefits were denied[.]"); *Bartholomew*, 588 F. Supp. 2d at 1270 (same).

Gerhardt's first basis for stricter review is that Liberty failed to consider Dr. Baskin's finding that Gerhardt was disabled in 2010.  Dr. Baskin did not address her condition in 2006, which is the relevant period for the current dispute, nor is it possible to infer from his report what Gerhardt's condition was in 2006.  Consequently, Dr. Baskin's report is not relevant to Gerhardt's claim, and Liberty's refusal to consider this evidence does not require a more demanding standard of review.

Similarly, neither the fact that Gerhardt turned 55 in 2008, nor the evidence that she suffered side effects from medications, Methotrexate and Plaquenil, prescribed to her for a condition for which she was diagnosed in the middle of 2010, namely, rheumatoid arthritis, is relevant to whether Gerhardt ceased to be disabled in 2006.  Therefore, Liberty's failure to consider this evidence does not necessitate a less deferential review.

14

Nevertheless, as explained in the prior opinion and order, this Court will not rubberstamp a decision to terminate benefits even under the deferential standard of review.  Under the abuse of discretion standard, the proper inquiry is whether Liberty's decision was reasonable, that is, whether it was supported by substantial evidence.  *Ortlieb v. United HealthCare Choice Plans*, 387 F.3d 778, 781 (8th Cir. 2004).  Substantial evidence is "more than a scintilla but less than a preponderance." *Smith v. Unum Life Ins. Co. of Am.*, 305 F.3d 789, 794 (8th Cir. 2002).  "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Fletcher-Merrit v. NorAm Energy Corp.*, 250 F.3d 1174, 1179 (8th Cir. 2001).  An administrator's decision is reasonable if a reasonable person could have reached a similar decision, given the evidence in the record, not whether the reasonable person would have reached that decision. *Ferrari v. Teachers Ins. & Annuity Ass'n*, 278 F.3d 801, 807 (8th Cir. 2002).

In summary, the Court will consider whether Liberty abused its discretion in concluding that Gerhardt ceased to be disabled under the plan in 2006.  The Court will also consider Liberty's conflict of interest in determining whether Liberty abused its discretion.

## IV.

Gerhardt contends that Liberty's determination was unreasonable because Liberty failed to consider medical evidence tending to establish that she was disabled.  Gerhardt relies upon each of the alleged failures which she also alleged constituted procedural errors.

As discussed above, Liberty did not err in refusing to consider Dr. Baskin's 2010 report, the fact that Gerhardt turned 55 in late 2008, and the effects of the medications prescribed for her rheumatoid arthritis, because that evidence is not relevant to Gerhardt's claim that she was entitled

15

to continued benefits by reason of disability in 2006.[4]  Therefore, Liberty did not abuse its discretion in failing to consider that evidence.

**A.**       **Dr. Safman's Original Independent Medical Evaluation Report**

Gerhardt contends that Liberty's decision was unreasonable because Liberty did not consider Dr. Bruce Safman's original independent medical evaluation report.  That report was prepared on August 8, 2005.  A.R. 2999-3001.  In his report, Dr. Safman concluded: "I believe with fybromyalgia, as severe as that which she appears to have, that there will be days when she could not participate in sedentary activities, and there were other days when she could."  A.R. 3001.  Gerhardt contends that this statement supports her disability claim, and yet was not considered by Liberty.  Rather, according to Gerhardt, Liberty only considered an "edited" report which did not include the above language.

Liberty contends that Gerhardt's acquisition of the original report was a violation of a Court order and that the report should be disregarded.  Regardless, as discussed above, the evidence indicates that Liberty eventually did consider Dr. Safman's original report.  *See* A.R. 1476, 1478; *Bartholomew*, 588 F. Supp. 2d at 1270.[5]

---

[4] In her reply brief, Gerhardt clarifies that she does not argue that she was disabled by any of the medications prescribed to her during 2006 but, rather, that Liberty erred in failing to consider the side effects she experienced from the Methotrexate and Plaquenil prescribed in relation to her 2010 diagnosis of rheumatoid arthritis.

[5] Below, the Court considers Gerhardt's contention that Dr. Safman's original report undermines Liberty's finding that Gerhardt could perform "with reasonable continuity" all of the material and substantial duties of an occupation for which she was reasonably fitted.

**B.       Transferable Skills Analysis Reports**

Gerhardt contends that Liberty's decision was unreasonable because Liberty relied on Marques' transferable skills analysis reports stating that Gerhardt could perform occupations requiring frequent reaching even though Gerhardt's functional capacity evaluation found that such physical activity was beyond Gerhardt's physical limitations. *See* A.R. 381-87.  As noted, Moore drafted two reports stating that Gerhardt could not perform most of the occupations identified in the transferable skills analysis reports because they required a greater amount of reaching than permitted by Gerhardt's functional capacity evaluation.  A.R. 1416-17, 2161.

However, in her updated report, Marques explained that Moore's conclusions regarding the amount of reaching these positions required were based on the Dictionary of Occupational Titles which has not been updated since 1993.  A.R. 1395.  Marques further stated that the Dictionary was outdated because advances in technology have changed the nature of the physical requirements of the positions identified in the transferable skills analysis reports.  Specifically, Marques explained that the introduction of computers, ergonomic work stations, and headsets have reduced the frequency that reaching is required in these positions.  A.R. 1397-98.  Marques remarked that her findings are consistent with the newer Occupational Information Network, but noted that the O*Net "does not provide specific strength information."  A.R. 1395.

Marques' report provides substantial evidence for finding that the identified occupations do not exceed Gerhardt's physical limitations in the area of reaching.  *Cf. Hillier v. Soc. Sec. Admin.*, 486 F.3d 359 (8th Cir. 2007) (substantial evidence supported finding that claimant could work as a cashier, even if vocational expert's [] testimony that claimant could perform such work was arguably inconsistent with the Dictionary of Occupational Titles' [] definition of the cashier job); *Jones*, 315

F.3d at 979 (concluding a claimant had the mental capacity to perform work, even though the work exceeded the claimant's skill level according to the Dictionary of Occupational Titles, based on the claimant's prior work history).[6]

## C.    Mental Capacity

Gerhardt contends that Liberty's decision was unreasonable because Liberty did not consider medical evidence that Gerhardt lacked the mental capacity to perform the jobs identified in the transferable skills analysis reports.  Gerhardt relies upon Dr. Baskin's 2004 report stating that Gerhardt suffered from "chronic fatigue, concentration problems and some associated ADHD," A.R. 690, and upon Dr. Safman's 2005 report stating that Gerhardt's "chronic fatigue and generalized pain" would restrict her ability to participate in physical as well as cognitive activities, A.R. 3000. As Gerhardt notes, the Court previously found that Liberty failed to have an analysis performed of the mental demands of the identified positions.  Document #55 at 24.  Gerhardt contends that Liberty again failed to provide for any such analysis after remand.

However, as Gerhardt concedes, Dr. Knott examined Gerhardt after remand and concluded that Gerhardt appeared cognitively intact and did not have obvious limitations from her medications. A.R. 1629.  Liberty sought a clarification from Dr. Knott, and he responded by stating that Gerhardt's cognitive limitations would not have precluded her from working from May of 2006 to October of

---

[6] Similarly, Gerhardt argues that she could not perform one of the occupations identified by Marques, namely, Health Service Provider, because it required light rather than sedentary work.  As with the issue of reaching, the dispute turns on whether the O*NET reliably describes the requirements of the position in view of technological and ergonomic advances over the past years. The analysis and conclusion; namely, that Liberty's decision is supported by substantial evidence, would likely be the same.  Nevertheless, the Court need not address this issue since it concerns only one of occupations identified in Marques' reports.  Furthermore, as discussed below, this position requires a bachelor's degree or RN license, both of which Gerhardt lacked in 2006.

2006.  Furthermore, Dr. Marion authored a peer-review report stating that, for the relevant 2006 period, there "were no objective neurological deficits, nor were there reported adverse cognitive deficits as a result of [Gerhardt's] prescribed medications."  A.R. 1378.  Dr. Marion concluded that Gerhardt's objective impairments would not have precluded her from performing sedentary work in 2006.  *Id.*

The opinions of Drs. Knott and Marion, even if they conflict with those of Drs. Baskin and Safman, constitute substantial evidence supporting Liberty's determination that Gerhardt's mental capacity did not preclude her from performing the identified occupations in 2006.[7]  *See Smith*, 305 F.3d at 794 ("When a conflict in medical opinions exists, the plan administrator does not abuse his discretion by adopting one opinion, if reasonable, and finding that the employee is not disabled.").

## D.    Loss of Nurse's License

Gerhardt contends that Liberty's decision was unreasonable because Liberty did not consider that Gerhardt lost her nursing license and, consequently, was unable to perform all but one of the jobs identified by Liberty as within Gerhardt's capabilities.  Gerhardt points to Moore's post-remand report states that "[l]abor market research performed on 03/20/10 confirmed that either a bachelor's degree or RN license is required in all of the [identified] occupations except dispatcher."  A.R. 2161.

Liberty contends that its ruling was reasonable because, even if Moore's research was correct, Gerhardt could still perform one of the jobs identified.  Furthermore, Marques' report states that, while Gerhardt no longer had an RN license, her past work experience and training support the conclusion that she could perform sedentary occupations.  A.R. 1398.

---

[7] Gerhardt contends that the physicians' reports neglect to consider the effect of the medications she was prescribed in 2010.  For the reasons discussed above, any mental limitations resulting from these medications are irrelevant.

The plan provides that Gerhardt would no longer be disabled if, after receiving benefits for twenty-four months, she were able to perform any other occupation for which she is reasonably fitted. A.R. 823. Consequently, even if Gerhardt was only capable of performing one of the occupations identified in Marques' report, the Court cannot say that, pursuant to the plan's terms, Liberty's determination that Gerhardt was no longer disabled in 2006 is unsupported by substantial evidence in this regard. *Cf. Hakes v. Astrue*, 383 F. App'x 581, 583 (8th Cir. 2010) (per curiam) (no error in holding that claimant was not disabled based on vocational expert's testimony, even though the expert identified only one occupation); *Tommasetti v. Astrue*, 533 F.3d 1035, 1043-44 (9th Cir. 2008) (administrative law judge did not err in holding that social security claimant was not disabled even though only one occupation to which claimant could adjust was identified).

## E.      Reasonable Continuity

Finally, Gerhardt contends that Liberty's decision was unreasonable because Liberty failed to consider evidence that, even if Gerhardt was able to work most days, she was not able to perform "with reasonable continuity" all material and substantial duties of the identified jobs. *See* A.R. 823. Moore reported that Gerhardt would be unable to maintain employment if she regularly had one to two unscheduled absences every month. A.R. 2162. Dr. Baskin observed that Gerhardt's joint complaints and fatigue related to her rheumatoid arthritis would prevent her from working a regular schedule or even part-time work. A.R. 1446. Furthermore, Dr. Safman's original report states that "there will be days when [Gerhardt] could not participate in sedentary activities[.]" A.R. 3001.

As explained above, Dr. Baskin report is based on Gerhardt's changed medical conditions, including her 2010 diagnosis of rheumatoid arthritis, but does not address her condition in 2006. Dr. Safman's statement is somewhat ambiguous. It is not clear from his report how often Gerhardt could

20

be expected to encounter days when she could not participate in sedentary activities. Nevertheless, Dr. Safman's report does provide evidence for the proposition that, in 2006, Gerhardt may not have been able to perform sedentary work with reasonable continuity.

Dr. Safman and Moore's reports notwithstanding, there is substantial evidence tending to show that in 2006 Gerhardt was able to work, with certain limitations, in a full-time position. As the Court noted in its prior opinion and order, three doctors, Baskin, Safman, and Denver, and one physical therapist, Grady, each separately concluded that Gerhardt could perform sedentary duties on a full time basis. Document #55 at 21. Furthermore, Drs. Knott and Marion both concluded that, with the limitations identified in the functional capacity evaluation, Gerhardt could work full-time in a sedentary occupation. A.R. 1380, 1581-82, 1630. The Court cannot say that Liberty abused its discretion in concluding that Gerhardt could perform sedentary work with reasonable continuity. *See Smith*, 305 F.3d at 794.

## CONCLUSION

On remand, Liberty considered not only Gerhardt's physical impairments, but also whether she had mental impairments, in addition to her physical impairments, that rendered her disabled in 2006. Liberty likewise addressed the side effects of Gerhardt's medications, her age, and other considerations. Contrary to Gerhardt's arguments, Liberty complied with the Court's remand order.

The evidence is in conflict. Although there is evidence to support Gerhardt's contention that she continued to be disabled in 2006, there also is substantial evidence to support Liberty's finding to the contrary. If the Court were to review *de novo*, Gerhardt might well prevail; but the Court's review is limited to determining whether Liberty abused its discretion. Because Liberty did not abuse its discretion, Liberty's decision to terminate Gerhardt's long-term disability benefits is AFFIRMED.

IT IS SO ORDERED this 14th day of August, 2012.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE